**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **REENGINEERING CONSULTANTS, LTD., d/b/a RESULTS ENGINEERING,** | **:** | |
| | **:** | **Case No. 2:08-cv-47** |
| **Plaintiff,** | **:** | **Judge Holschuh** |
| **v.** | **:** | **Magistrate Judge Abel** |
| **EMC CORP., f/k/a CAPTIVA SOFTWARE CORP.,** | **:** | |
| | **:** | |
| **Defendant.** | | |

## MEMORANDUM OPINION & ORDER

Plaintiff, Results Engineering ("Results"), an Ohio corporation, is a systems integrator and reseller of software products in the field of advanced capture technology. Defendant, EMC Corp. ("EMC"), is a developer and provider of software products and system solutions for which Plaintiff was an authorized reseller for various products over the course of the parties' business relationship. Plaintiff brings this suit against EMC for breach of contract and tortious interference with business relations. Plaintiff's claims arise from a contract (the "Captiva Agreement") that Plaintiff entered into with Captiva Software Corporation ("Captiva"), a California corporation, which has since been acquired by EMC. Prior to EMC's acquisition of Captiva, Captiva had itself acquired another software company, SWT USA, Inc. ("SWT"), with whom Plaintiff also had a contract. Plaintiff claims that EMC breached the Captiva Agreement, and also tortiously interfered with its business relations, by soliciting business from Plaintiff's prospective customers. This matter is currently before the court on Defendant's Motion for Summary Judgment (doc. # 47). For the reasons below, the Court **GRANTS** EMC's Motion for Summary Judgment (doc. # 47).

## I.     Background and Procedural History

## A.     The SWT Agreement

On June 10, 2004, Plaintiff entered into a contract with French software manufacturer and distributor, SWT, to market, demonstrate, and distribute SWT's b-Wize Dispatcher software. (Def.'s Mot. Summ. J. 5-6, Ex. A, doc. # 47.)   After negotiating the terms of the contract (the "SWT Agreement") with the assistance of counsel, Plaintiff entered into the SWT Agreement as a non-exclusive "Value Added Reseller" of b-Wize Dispatcher software and its corresponding user manuals and documentation. (SWT Agreement, Ex. A to Def.'s Mot. Summ. J., Arts. B.1, B.2, doc. # 47-1; Boyd Dep. 305-306, 403, 476-478, docs. ## 31-3, 31-9.)   Under the terms of the SWT Agreement, the parties agreed to a limitation of liability provision which provides that neither party would be liable to the other "for any loss of profit or any other indirect damage, including, but not limited to, special, incidental, consequential, punitive, or other indirect or unpredictable loss or damages under any cause of action arising out of or relating to this Agreement . . . ." (Def.'s Mot. Summ. J. Ex. A, Art. C.8, doc. # 47-1.)   The agreement further provides that "[n]o claim may be brought by the VAR [Value Added Reseller] under this Agreement more than one (1) year after accrual of such claim." (Id.)   Article H of the SWT Agreement establishes that in the event of litigation, the controversy will be settled "according to the laws of New York State, irrespective of its conflict of law rules." (Id., Art. H.)   Finally, the contract contains an integration clause stating that the contract represents the entire agreement between the parties and further provides that the agreement may only be modified in writing, with the signatures of both parties. (Id. Art. I.)

## B.     The Captiva Agreement

On October 1, 2004, Plaintiff entered into a contract with Captiva. (Captiva Agreement, Ex. B to Def.'s Mot. Summ. J., doc. # 47-2.)   The Captiva Agreement authorized Plaintiff to market and

2

sell certain software solutions to Plaintiff's end-users or prospects as a non-exclusive reseller. (Id.) The agreement authorized Plaintiff to resell FormWare, InvoicePack, ClaimPack, and Input*Accel* software. (Id.)  Like the SWT Agreement, ¶ 10 of the Captiva Agreement establishes limits on liability, precluding Plaintiff from recovering ". . . consequential, incidental, or special damages, even if Captiva has been apprised of the likelihood of such damages occurring." (Id. ¶ 10 (all capital font in original omitted)).  Paragraph 10 also provides that, "[i]n no event will Captiva's liability . . . to reseller arising out of or relating to this agreement . . . exceed the amount actually paid by [Plaintiff] to Captiva for the product(s) relating to said action or claim in contract, tort or otherwise." (Id.)  Paragraph 12 specifies that the law of California will govern the agreement and also that the contract represents the entire agreement between the parties and as such, may only be modified through a written intsrument signed by both parties. (Id.)

Unlike the SWT Agreement however, the Captiva Agreement does not limit the time within which Plaintiff may bring a claim under the contract.  Additionally, and in contrast to the SWT Agreement, the Captiva Agreement provides for certain "rules of engagement" regarding Captiva's conduct with respect to Plaintiff's end-users or prospects.  Paragraph 8(d) of the Captiva Agreement, which is the basis of Plaintiff's lawsuit for breach of contract,  prohibits Captiva from knowingly soliciting business from Plaintiff's end-users or prospects. (Id.)  The provision also requires Captiva to make reasonable efforts to refer inquiries it knowingly receives from Plaintiff's current or prospective customers to Plaintiff.  Finally, the provision requires that Captiva notify Plaintiff in the event that one of Plaintiff's end-users or prospects insists on doing business directly with Captiva, and thereafter wait 72 hours before accepting or shipping such an order. (Id.)

**C.      The Marketing Support Agreement with EMC**

On November 30, 2004, Plaintiff entered into an "Authorized Reseller Marketing Support Agreement" with EMC. (Marketing Support Agreement, Ex. E to Def.'s Mot. Summ. J., doc. # 47-5.) Unlike the SWT and Captiva Agreements, this contract did not give Plaintiff the authority to resell certain EMC products but rather, provided technical and other marketing support to Plaintiff based on Plaintiff's representation that it had an effective reseller agreement with one of EMC's distributors. (Id. at Introductory Paragraph, § 2.1.) In this case, Plaintiff warranted that it had a reseller agreement with the EMC distributor Optical Laser to sell one of EMC's products. (Id.; Def.'s Mot. Summ. J. 40, doc. # 47; Pl.'s Mem. in Opp'n 15, doc. # 36.) Thus, the Marketing Support Agreement gave Plaintiff access to certain EMC websites, logos, marketing tools, and training in connection with Plaintiff's reseller agreement with Optical Laser. (Marketing Support Agreement, Ex. E to Def.'s Mot. Summ. J., doc. # 47-5.) The Agreement did not, however, contain any rules of engagement, like those in the Captiva Agreement ¶ 8(d), barring EMC from directly selling any of its products to Plaintiff's prospective end-user, nor does it identify the prospective end-user. (See id.)

### D.      Captiva's Acquisition of SWT and EMC's Acquisition of Captiva

In May 2005, Captiva acquired SWT. (Def.'s Mot. Summ. J. 10, doc. # 47.) Later that same year, on approximately December 31, 2005, EMC acquired Captiva. (Id.) Both the SWT and Captiva Agreements pre-date Captiva's acquisition of SWT in May 2005, as those contracts were entered into in June and October of 2004, respectively. However, throughout both acquisitions, Captiva and EMC continued to operate under the terms of both the Captiva and SWT Agreements. In fact, Plaintiff's president, Mr. Boyd, recognized this fact in June 2005, shortly after Captiva had acquired SWT, when he notified Captiva that although the Captiva Agreement did not allow for

product returns, the SWT Agreement did, with payment of a 2% restocking fee.  (Ex. 31 to Boyd

Dep., doc. # 31-5.)  Plaintiff and Captiva were able to agree on the elimination of that 2% restocking

fee, and consequently amended the SWT Agreement in July 2005 through an exchange of emails.

(Boyd Dep. 300-06, doc. # 31-3; Exs. 30, 31 to Boyd Dep. docs. ## 31-4, 31-5.)

　　　Thereafter, once EMC had acquired Captiva in December 2005, EMC likewise continued

to operate under both the Captiva and SWT Agreements, recognizing and communicating to Plaintiff

in February 2006 that the terms of both agreements differed and that the SWT Agreement governed

the sale of b-Wize Dispatcher. (Exs. 12, 14 to Boyd Dep., docs. ## 31-18, 31-19.)  Furthermore, in

April 2006, EMC gave Plaintiff the opportunity to sign a new, more uniform EMC reseller

agreement or instead, continue to operate under the SWT Agreement until its expiration in June

2006. (Def.'s Mot. Summ. J. 10, Ex. D, docs. ## 47, 47-4.)

### E.　　The Disputes Involving Plaintiff's End-users

　　　Defendant's motion for summary judgment and Plaintiff's memorandum in opposition to that

motion indicate that there are presently nine disputes in this action.[1]

### 1.　　FirstMerit Bank

　　　At some point in 2004, Plaintiff began working on an advanced capture solution involving

SWT's b-Wize and Dispatcher products for FirstMerit Bank. (Def.'s Mot. Summ. J. 11, doc. # 47;

---

　　　[1]This Court's Memorandum Opinion & Order of January 14, 2009, ruling on Defendant's
motion to dismiss, identified five specific end-users which were the subject of Plaintiff's claims
for both breach and tortious business interference. (Mem. Op. & Order 2, doc. #20.)  Plaintiff's
Second Amended Complaint added two additional disputes that were revealed during discovery.
(Doc. # 45.)  Several state agencies were also mentioned in a paragraph of the Second Amended
Complaint as potential losses flowing from Defendant's conduct but were not specifically
identified as end-users with whom Defendant breached ¶ 8(d). (See ¶¶ 11-12, doc. # 45.)
Regardless, both sides now argue that nine specific disputes exist in this action.

Boyd Dep. 488-89, doc.# 31-9; Second Am. Compl. ¶¶ 6-7, doc. # 45.) Plaintiff had been initially engaged by IBM to work on this project. (Id.) Plaintiff alleges that it invited Captiva to join in this opportunity. (Second Am. Compl. ¶ 7.) On or about December 31, 2004, Captiva closed on this deal with FirstMerit, selling the software and services directly to this customer itself. (Def.'s Mot. Summ. J. 11, doc. # 47.)

2.    <strong>Lucas County Criminal Justice Coordinating Council, Ohio State Term Schedule, and Ohio Department of Health</strong>

In May 2005, Plaintiff entered into an enterprise license agreement with Lucas County, Ohio for an SWT software solution. The enterprise license would allow all other Lucas County agencies to use SWT software at no additional charge. (Second Am. Compl. ¶¶ 8-9, doc. # 45; Def.'s Mot. Summ. J. 13, doc. # 47.) The Lucas County Criminal Justice Coordinating Council ("CJCC") was one such agency. (Second Am. Compl. ¶ 10.) Prior to May 2005, Plaintiff was listed as the only provider of SWT software on the Ohio State Term Schedule, a schedule which permits Ohio agencies to license software from companies on the list without going through the competitive bid process. (Id. ¶ 11; Def.'s Mot. Summ. J. 14.) The terms of Plaintiff's state term contract required SWT to provide a letter of supply confirming that Plaintiff was a reseller of the software and that it was providing the best commercial pricing. (Boyd Dep. 138-39, doc. # 31-1.)

At some point before Captiva acquired SWT in May 2005, SWT engaged another reseller, a company called Intellinetics, to sell its b-Wize Dispatcher products. (Second Am. Compl. ¶ 10; Def.'s Mot. Summ. J. 13.) After Captiva acquired SWT, Intellinetics sold b-Wize Dispatcher to the CJCC at a lower price than that listed by Results on the State Term Schedule, apparently with the help of Captiva, and in spite of the fact that CJCC could have used the software for free under Lucas

6

County's enterprise license. (Boyd Dep. 138-39, doc. # 31-1.)  According to Plaintiff, this sale by Intellinetics violated the terms of Results' contract with the state and consequently, it lost its listing on the State Term Schedule and its ability to sell SWT software, without going through the competitive bid process, to agencies like the Ohio Department of Health ("ODH"). (Id.)

### 3.    Lithia Motors

In August 2005, Captiva approached Plaintiff about an opportunity to provide a solution involving b-Wize and b-Wize Dispatcher to Lithia Motors. (Def.'s Mot. Summ. J. 14, doc. # 47; Dep. Ex. 67, doc. # 31-17.)  Plaintiff began significant work on this opportunity, partnering with IBM and Captiva to create the software solution to offer Lithia Motors. (Boyd. Dep. 182-84, doc. # 31-1.)  In or around December 16, 2005, Captiva sold the software directly to Lithia, after Lithia requested to deal directly with Captiva to purchase the software. (Kara Stemple Dep. 32, doc. # 31-14; Dep. Ex. 6, doc. # 31-15.)

### 4.    ACS

In 2005, both Plaintiff and Captiva were pursuing an opportunity to sell b-Wize Dispatcher software to ACS. (Def.'s Mot. Summ. J. 15, doc. # 47.)  According to Plaintiff, it had invited Captiva to join in the opportunity and thereafter, Captiva attempted to take the deal direct. (Second Am. Compl. ¶¶ 21, 24, doc. # 45.)  According to EMC, both Plaintiff and Captiva had pursued ACS through each's respective contacts and in February 2006, EMC, which had since acquired Captiva, notified Plaintiff of ACS's intent to deal directly with EMC/Captiva. (Def.'s Mot. Summ. J. 15; Dep. Ex. 12, doc. # 31-18.)  Consequently, Plaintiff accused EMC of violating ¶ 8(d) of the Captiva Agreement. (Dep. Exs. 12, 14, docs. ## 31-18, 31-19.)  Regardless, the deal fell apart by March 2006 and neither party made a sale to ACS. (Id.)

### 5. Family Heritage Life Insurance

In 2005, Plaintiff was working with SWT on a software deal with Family Heritage Life Insurance. In August 2005, after Captiva had acquired SWT, Plaintiff and Captiva sold b-Wize Dispatcher software to Family Heritage, and Plaintiff performed the installation. (Def.'s Mot. Summ. J. 15, doc. # 47; Second Am. Compl. ¶¶ 30-31, doc. # 45.) In May 2006, Family Heritage demanded a refund of the moneys it paid for the software and services from Captiva. (Def.'s Mot. Summ. J. 15.) According to Plaintiff, this was because system errors were not corrected by EMC/Captiva. EMC did not issue a refund to Family Heritage and consequently, Family Heritage terminated its relationship with EMC and Plaintiff. (Second Am. Compl. ¶¶ 32-37.)

### 6. Westfield Insurance

Sometime in or around 2003, Plaintiff sold Input*Accel*, a Captiva solution, to Westfield Insurance. (Boyd Dep. 34-40, doc. # 31-1.) Although the timing is still unclear, either in 2004 or 2005, Captiva went directly to Westfield Insurance and secured an annual maintenance agreement with Westfield, consequently depriving Plaintiff of revenue it would have ordinarily obtained through the provision of continuing maintenance after the initial sale of this product. (Id.; Def.'s Mot. Summ. J. 11, 38, doc. # 47; Pl.'s Mem. in Opp'n 14, doc. # 36.)

### 7. Ohio Department of Public Safety

In 2002 and 2003, Plaintiff was engaged to assist with the design of an imaging system for the Ohio Department of Public Safety (ODPS), which ultimately would involve EMC's Centera hardware. (Second Am. Compl. ¶ 25, doc. # 45; Pl.'s Mem. in Opp'n 15, doc. # 36; Def.'s Mot. Summ. J. 12, doc. # 47.) Plaintiff sought to register this opportunity with EMC, although it is not clear when Plaintiff attempted to do so and the parties dispute whether the request was ultimately

8

approved or rejected. (Pl.'s Mem. in Opp'n 15, doc. # 36; Boyd Aff. ¶ 12, doc. # 36-1; Def.'s Mot.

Summ. J. 12, doc. # 47.)  Registration of the opportunity would have entitled Plaintiff to receive

better pricing from EMC, in order to secure this deal. (Boyd Aff. ¶ 14, Ex. 1, doc. # 36-1.)

Regardless of the disputed registration of this opportunity, on November 30, 2004**,** Plaintiff entered

into a Marketing Support Agreement with EMC, warranting that it had an effective reseller

agreement with the EMC distributor Optical Laser. (Marketing Support Agreement, Ex. E to Def.'s

Mot. Summ. J., doc. # 47-5.)  Although the Marketing Support Agreement does not identify the

EMC product or Plaintiff's prospective end-user, this agreement was apparently entered into so that

Plaintiff could sell EMC's Centera hardware to ODPS. (Def.'s Mot. Summ. J. 12, doc. # 47; Pl.'s

Mem. in Opp'n 14, doc. # 36.)  EMC's obligations under the agreement were to provide Plaintiff

access to certain EMC websites, logos, marketing tools, and training in connection with Plaintiff's

reseller agreement with Optical Laser. (Marketing Support Agreement, Def.'s Mot. Summ. J., Ex.

E, doc. # 47-5.)  Ultimately, EMC partnered with Unisys, a reseller of Centera, to close this deal

with ODPS in June 2006 and paid Unisys accordingly. (Def.'s Mot. Summ. J. 12, doc. # 47; Flynn

Dep. 91, doc. # 31-13.)

      **F.**    **Termination of the Relationship Between Results and EMC**

      On December 23, 2005, several months after Captiva acquired SWT and one week before

EMC acquired Captiva, Results' President Greg Boyd wrote a letter to Captiva claiming that Captiva

had breached its agreement with Results and tortiously interfered with its business with respect to

Lithia Motors, FirstMerit Bank, CJCC, the Ohio State Term Schedule, ODH and the Ohio Bureau

of Worker's Compensation ("BWC"). (Dep. Ex. 7, doc. # 31-2.)  After EMC's acquisition of

Captiva, EMC tried to resolve these disputes with  Results over the next year to no avail. (Def.'s

Mot. Summ. J. 16, doc. # 47.)  By the spring of 2007,  EMC notified Results of its intent to terminate

their business relationship. (Id.; Dep. Ex. 7, doc. # 31-2.)

### G.    Procedural History

On January 15, 2008, Plaintiff filed suit against EMC for breach of contract and tortious

business interference. (Doc. # 2.) On August 20, 2008, Plaintiff filed an Amended Complaint adding

two additional disputes. (See Am. Compl., doc. # 12.)  Plaintiff's Amended Complaint identified

five end-users with whom Plaintiff alleged Defendant made direct sales in contravention of ¶ 8(d)

of the Captiva Agreement or otherwise tortiously interfered with Plaintiff's business prospects.(Am.

Compl., doc. # 12.)  Plaintiff specifically alleged that Defendant's conduct breached ¶ 8(d) with

respect to end-users FirstMerit Bank, Lithia Motors, ACS, and ODPS. (Id. ¶¶ 30-40.)  With respect

to these four end-users plus a potential fifth, the CJCC, Plaintiff alleged that Defendant tortiously

interfered with its prospective economic advantage. (Id. ¶¶ 41-48.)  Additionally, Plaintiff alleged

that Defendant's conduct with respect to CJCC ultimately resulted in Plaintiff losing its listing on

Ohio's State Term Schedule. (Id. ¶¶ 11-12.)  As a result of losing the listing on the State Term

Schedule, Plaintiff claimed that it lost potential contracts with other state agencies including ODH,

BWC, and the Ohio Department of Job and Family Services. (Id. ¶¶ 12, 44.)  Plaintiff asserted that

Captiva's breach of contract and tortious interference with its business relations caused Plaintiff to

lose at least $1.5 million in profits, future license sales, professional services, and maintenance

revenue.

On August 29, 2008, Defendant moved to dismiss Plaintiff's tortious interference with

business relations claim under Federal Rule of Civil Procedure 12(c). (Doc. # 15).  The court granted

that motion on January 14, 2009, finding that the existence of a valid contract between the parties

and lack of any allegation of illegal motive on Defendant's part, precluded a tortious interference with business relations claim under Ohio law.  Thus, Plaintiff's tortious interference claim was dismissed with prejudice, leaving only the claims for breach of ¶ 8(d) of the Captiva Agreement for trial. (Doc. # 20.)

After a sufficient period of discovery, Defendant filed a Motion for Summary Judgment on June 22, 2009. (Doc. # 29.)  Plaintiff responded on August 7, 2009 (doc. # 36) and Defendant replied on September 4, 2009 (doc. # 40).  On the same date that Plaintiff responded to the motion for summary judgment, August 7, 2009, Plaintiff also filed a Motion for Leave to File Second Amended Complaint, seeking to add two additional disputes involving end-users Family Heritage Life Insurance and Westfield Insurance, alleging that EMC breached ¶ 8(d) of the Captiva Agreement with respect to these end-users as well. (Doc. # 34.)  On March 29, 2010, this Court granted that motion and denied Defendant's Motion for Summary Judgment (doc. # 29) as moot, allowing Defendant the opportunity to re-open discovery and refile a motion for summary judgment responsive to Plaintiff's Second Amended Complaint. (Doc. # 44.)  On that same date, Plaintiff filed its Second Amended Complaint. (Doc. # 45.)  Thereafter, on April 16, 2010, Defendant chose to forego further discovery and instead, refiled its original motion for summary judgment, deleting its arguments that the two new claims had not been pled, and making no further changes to its original brief. (Doc. # 47.)  On April 19, 2010, Defendant asked this Court to consider Plaintiff's previously filed response in opposition (doc. # 36) and Defendant's previously filed reply (doc. # 40) in conjunction with its refiled motion for summary judgment (doc. # 47). (Doc. # 48).  On May 24, 2010, the Court granted that motion. (Doc. # 53.)  Defendant's Motion for Summary Judgment is now ripe for adjudication.

## II.     Summary Judgment Standard

Although summary judgment should be cautiously invoked, it is an integral part of the

Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The

standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and
> disclosure materials on file, and any affidavits show that there is no genuine issue as
> to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Summary judgment will be granted "only where the moving party is entitled

to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine

issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right to

trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464,

467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also

Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if

there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978).

The court's duty is to determine only whether sufficient evidence has been presented to make the

issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of

witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that

no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.

Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as

inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its

response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

## IV.  Analysis

Plaintiff brings breach of contract claims against Defendant on the basis of a Reseller Agreement entered into on October 1, 2004, with Captiva, Defendant EMC's predecessor.  Plaintiff argues that ¶ 8(d) of that contract was violated when EMC knowingly solicited orders from Plaintiff's customers, or prospective customers, in violation of the terms of ¶ 8(d).[2] (Second Am.

---

[2]Paragraph 8(d) of the Captiva Agreement states that "Captiva will not knowingly solicit orders from Reseller's End Users or prospects and will make all reasonable efforts to refer inquiries it knowingly receives from such parties to Reseller."  If the end-user or prospect still wishes to do business directly with Captiva, ". . . then Captiva will provide a quote to or accept an order from such party . . ." but will "make all reasonable efforts to notify Reseller of the quote or order and will wait seventy-two (72) hours" before shipping or accepting that order. Paragraph 8(d) further provides that during this 72 hour waiting period, the end-user or prospect will be allowed to cancel its order with Captiva and place it through the Reseller instead.  In the event that the end-user has only notified Captiva that it wishes to deal directly in the future, rather than presently requesting a quote or placing an order, Captiva "will make all reasonable efforts to notify Reseller of the party's request and will wait seventy-two (72) hours before

14

Compl., doc. # 45.)  Plaintiff also now claims, in its response in opposition to summary judgment, that the ODPS dispute is actually governed by another document entitled "Deal Registration: Rules of Engagement & Guidelines" and dated June 2008. (Pl.'s Mem. in Opp'n 14-16, Ex. 1-E, doc. # 36.)  According to Plaintiff, it registered the ODPS opportunity with EMC and received approval for that sales opportunity, thus entitling Plaintiff to the benefits of deal registration. (Id. at 16.) Under the the "Rules of Engagement & Guidelines," EMC partners who registered and were approved for an opportunity were entitled to discount pricing and to "receive the support of the EMC Partner Support Center (PSC) and EMC sales resources as needed to win the opportunity."  (Id. at 15-16; Ex. 1-E.)

EMC, in its motion for summary judgment, argues that seven of the nine disputes in this case are actually governed by the SWT Agreement and consequently, not only was there no breach of the terms of that agreement, but any claims arising from the SWT Agreement are barred by the limitation of liability provision. (Def.'s Mot. Summ. J. 19-27, doc. # 47.)  With regard to the Westfield Insurance dispute, EMC argues that the limitation of liability provision in the Captiva Agreement bars the damages sought by Plaintiff and therefore, this claim also fails as a matter of law. (Id. at 38.)  Finally, with respect to ODPS, EMC argues that only the Marketing Support Agreement applies to that dispute and it contains no provision barring direct sales by EMC. (Id. at 38-41.) Furthermore, EMC argues that the "Deal Registration" document is inapplicable, given that it post-dates the ODPS dispute and the parties' contractual relationship, which ended in 2007, and that Plaintiff cannot now change its theory of recovery and produce a new document for the first

---

soliciting orders from such party." (Captiva Agreement, Ex. B to Def.'s mot. Summ. J., doc. # 47-2.)

time in order to defeat summary judgment. (Def.'s Reply 3, doc. # 40.)

   A.    **The Disputes Governed by the SWT Agreement**

EMC argues that seven of the nine disputes in this case are actually governed by the SWT

Agreement as those disputes involved the sale of b-Wize Dispatcher products and only the SWT

Agreement granted Plaintiff non-exclusive rights to resell that software. (Def.'s Mot. Summ. J. 8,

19-20, Ex. A, doc. # 47.)  Specifically, EMC cites Mr. Boyd's deposition testimony explaining that

SWT's b-Wize Dispatcher was involved in the sales, or potential sales, to FirstMerit Bank, Lithia

Motors, ACS, Family Heritage Life, CJCC, and ODH.  Additionally, the loss of the state term

contract involved Plaintiff's ability to sell SWT software on the State Term Schedule. (Boyd Dep.

122, 145, 148, 160-62, 174, 191, 210, 458-59, 470-71, 489-90, docs. ## 31-1, 31-3, 31-9.)

Furthermore, EMC explains that the SWT Agreement clearly governs these disputes because after

Captiva's acquisition of SWT and EMC's acquisition of Captiva, the terms of the SWT Agreement

continued to be honored by each successor corporation.  EMC explains that in fact, Plaintiff and

Captiva once amended the SWT Agreement via email and EMC continued to operate under the SWT

Agreement's terms, later offering Plaintiff the opportunity to sign a new reseller agreement with

EMC instead of operating under the terms of the SWT Agreement until its expiration. (Def.'s Mot.

Summ. J. 10, 23, 24, doc. # 47; Exs. 30, 31, 12, 14 to Boyd Dep., docs. ## 31-4, 31-5, 31-18, 31-19.)

Thus, EMC argues, given the integration clause in the SWT Agreement and the parties' conduct with

respect to the separate SWT and Captiva Agreements, the SWT Agreement is the only agreement

that can apply to the above-mentioned disputes. (Def.'s Mot. Summ. J. 21-24, Ex. A , doc. # 47.)

Consequently, under the terms of the SWT Agreement, New York law applies. (Id. at 17.)   EMC

argues that the limitation of liability provision is enforceable under New York law and therefore,

16

Plaintiff's claims are time-barred under the one (1) year limitations period agreed to in the contract. Further, even if the claims were not time-barred, EMC maintains that Plaintiff's claim for damages is precluded by its contractual waiver of incidental and consequential damages, including lost profits. (Id. at 24-32.) Finally, EMC argues that the SWT Agreement does not contain "rules of engagement" like those found in ¶ 8(d) of the Captiva Agreement, and thus, even if Plaintiff could bring these claims, there was no breach of any provision of the SWT Agreement. (Id. at 32.)

In response, Plaintiff does not dispute that b-Wize Dispatcher was the product involved in the above-mentioned sales or potential sales, nor does Plaintiff dispute that the SWT Agreement applies. (Pl.'s Mem. in Opp'n 3-8, doc. # 36.) Instead, Plaintiff argues only that the Captiva Agreement also applies to these seven disputes. Plaintiff maintains that Captiva's price list was incorporated into the Captiva Agreement, and that the price list contains a Dispatcher product which "is exactly the same as the b-Wize Dispatcher in the SWT Agreement." (Id. at 8-9; Captiva Price List 12, Ex. 1-C, doc. # 36-4.) Thus, Plaintiff argues it was entitled to resell the b-Wize Dispatcher under the Captiva Agreement, making ¶ 8(d) applicable to these seven disputes. (Pl.'s Mem. in Opp'n 8-9, doc. # 36; Boyd Aff. ¶ 6, Ex. 1 to Pl.'s Mem. in Opp'n, doc. # 36-1.) In support of this argument, Plaintiff cites ¶ 1(a) of the Captiva Agreement which states, in pertinent part, that

> . . . Captiva appoints Reseller a **non-exclusive** relicensor . . . of the software products designated above (the "Software") and authorizes Reseller to market the Software (and related support services, professional services and training) to end users (not other resellers) in the Territory specified above (geography or market). Specific product items (the "Products") and their list prices are listed in the Captiva Price List. Reseller may not resell any product designated "NFR" in the price list.

(Ex. 1-A to Pl.'s Mem. in Opp'n, doc. # 36) (emphasis in original). Plaintiff asserts that the last two sentences of this provision incorporated the Captiva Price List into the contract and therefore, gave

17

Plaintiff the right to resell not only the "Software," "designated above" in the contract as FormWare, InvoicePack, ClaimPack, and Input*Accel*, but also, to sell all the "products" contained in the price list "as long as the products [were] not designated 'NFR.'" (Pl.'s Mem. in Opp'n 9.) Consequently, Plaintiff argues, it had the right to sell the Dispatcher in the Captiva Price List, which was "exactly the same as the b-Wize Dispatcher in the SWT Agreement," and therefore, the "rules of engagement" found in ¶ 8(d) of the Captiva Agreement apply to these disputes and genuine issues of material fact exist as to whether EMC breached the Captiva Agreement. (Id.)

In its reply, EMC points out that both the SWT Agreement and Captiva Agreement were entered into months before Captiva acquired SWT.  (See Exs. A, B to Def.'s Mot. Summ. J., docs. ## 47-1, 47-2.)  EMC argues that under California law, which governs the Captiva Agreement, contract interpretation must 'give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Def.'s Reply 6, doc. # 40) (citing Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1040, 1048 (C.D. Cal. 2003) (applying California law)).  Therefore, at a time when both were separate companies, Captiva could not have logically intended its contract with Plaintiff to encompass an SWT product that it did not own. (Def.'s Reply 6, 8, doc. # 40.)  Furthermore, the Captiva Agreement unambiguously designates only FormWare, InvoicePack, ClaimPack, and Input*Accel* as the products which Plaintiff was entitled to resell; not every Captiva product that it currently owned, or might in the future own. (Id.)  Under the integration clause of the Captiva Agreement, ¶ 12(b), EMC explains that any modification made to include SWT's b-Wize Dispatcher or otherwise incorporate the SWT Agreement into the Captiva Agreement would have required a writing signed by both parties. (Id. at 5.)  EMC further argues that the Captiva Price List submitted by Plaintiff is inapplicable as it is dated September 26, 2005 – nearly

one year <u>after</u> the Captiva Agreement was entered into and several months after the merger of Captiva

and SWT. (<u>Id</u>. at 8.)   Furthermore, that price list does not even include ClaimPack or InvoicePack,

two of the specific products Plaintiff had the right to resell under the terms of the Captiva Agreement.

(<u>Id</u>.) EMC argues that the Captiva Price List, and its mention in the last sentence of ¶ 1(a), does not

confer any rights on Plaintiff but rather, directs Plaintiff to a "more complete list of the related

Software products and their prices." (<u>Id</u>.)

The Court agrees with EMC and finds that only the SWT Agreement applies to the disputes

involving FirstMerit Bank, Lithia Motors, ACS, and Family Heritage Life Insurance[3].  To the extent

that claims exist regarding CJCC, ODH, and the loss of the Ohio State Term Schedule, the SWT

Agreement would apply to those disputes as well.[4]  Plaintiff does not dispute that the choice of law

---

[3]Although Plaintiff's claim for breach of contract is based solely on violation of ¶ 8(d) of the Captiva Agreement (Second Am. Compl. ¶ 42; Pl.'s Mem. in Opp'n 5-6), the claim regarding Family Heritage Life involves allegations that Captiva provided malfunctioning software, and refused to provide a refund thereafter, to Family Heritage, resulting in Family Heritage's termination of its relationship with Plaintiff. (Second Am. Compl. ¶¶ 32-37.)  It does not appear that this dispute involves conduct that would breach ¶ 8(d). In fact, Plaintiff does not respond to Defendant's arguments that this claim, at best, involves either the limited 90 day warranty to the end-user under Article C.5, which would have expired in late 2005, or Family Heritage's rights under its End-User Agreement with Captiva, an agreement under which Plaintiff has no rights. (<u>See</u> Def.'s Mot. Summ. J. 35-36; Pl.'s Mem. in Opp'n 1-13.)  Nevertheless, the SWT Agreement would be the only applicable contract and Plaintiff has not attempted to state a claim for breach under any provision of that agreement.

[4]Plaintiff's Amended and Second Amended Complaints only identify the CJCC dispute under its now-dismissed second cause of action for tortious business interference.  Plaintiff only listed FirstMerit, Lithia Motors, ACS, and ODPS as end-users with whom EMC had breached ¶ 8(d) of the Captiva Agreement.  (<u>See</u> Am. Compl. ¶¶ 30-40; Second Am. Compl. ¶¶ 41-51.) In fact, Plaintiff's Amended and Second Amended Complaints allege, under the second claim for tortious business interference, that "[i]n addition to the breach of contract claims, the above facts for <u>all five deals</u> show that Captiva committed th[is] tort . . . ." (Am. Compl. ¶ 42; Second Am. Compl. ¶ 53) (emphasis added).  Consequently, when the Court addressed Defendant's motion to dismiss on January 14, 2009, the Court understood Plaintiff's Amended Complaint to allege both breach of contract and tortious interference claims with respect to four end-users, and one

provision in either contract is valid and enforceable and thus, under New York law, which governs the SWT Agreement, "a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." Riverside South Planning Corp. v. CRP/Extell Riverside, L.P., 869 N.Y.S.2d 511, 516 (N.Y. App. Div. 2008) (citing W.W.W. Assoc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990)).  A contract is unambiguous where, "on its face [it] is reasonably susceptible of only one meaning." Id. (citation omitted). "Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain." Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 695 (N.Y. 1995). Similarly, under California law, which governs the Captiva Agreement, '[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' Nat'l Rural Telecomms. Coop., 319 F. Supp. 2d at 1046 (quoting Cal. Civ.Code § 1638). Interpretation of the contract must "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Id. at 1048 (citing Cal. Civ. Code § 1636).

 Here, both agreements clearly and unambiguously designate the product(s) which Plaintiff

---

additional claim for tortious interference with respect to a fifth end-user: CJCC. (Mem. Op. & Order 2, doc. # 20.)  And it is only within the CJCC claim that Plaintiff mentions ODH and the loss of the state term contract. (Am. Compl. ¶¶ 11-12.)  Therefore, under this Court's previous Order, it appears that this CJCC claim, and any losses from a potential contract with ODH or from losing the state term listing, were already dismissed.  Nevertheless, to the extent that Defendant has understood Plaintiff's claims to also allege breach of contract with respect to these users, and to the extent that the parties have continued to argue about the merits of these claims, the Court finds that the SWT Agreement applies given that the underlying disputes involve the sale of b-Wize Dispatcher.

was entitled to resell under each agreement and therefore, the terms of each agreement only apply to the specified product or products. The SWT Agreement grants Plaintiff the non-exclusive right to resell b-Wize Dispatcher and the Captiva Agreement authorizes Plaintiff to resell FormWare, InvoicePack, ClaimPack, and Input*Accel*. Additionally, both agreements allow for modifcation only if in writing, and signed by both parties. (See Ex.s A, B to Def.'s Mot. Summ. J., docs. ## 47-1, 47-2.) There is no dispute that the Captiva Agreement was never modified by a signed writing to include b-Wize Dispatcher software after Captiva acquired SWT or after EMC acquired Captiva. In fact, Plaintiff concedes that the SWT Agreement applies to these seven disputes involving the sale of b-Wize Dispatcher but argues that the Captiva Agreement also applies to these disputes. However, Plaintiff does not cite any authority, let alone offer any explanation, as to how the Court can reconcile the inconsistencies between both agreements if both are allegedly applicable to these seven disputes. For instance, under what authority should the Court decide whether the New York choice of law provision from the SWT Agreement or the California choice of law provision under the Captiva Agreement should apply? Under what authority should the Court ignore the contractually agreed upon one (1) year limitations period for claims arising under the SWT Agreement, while simultaneously imposing the Captiva Agreement's "rules of enaggagement" on claims arising from the sale of b-Wize Dispatcher? Plaintiff offers no guidance on how or why the Court should do this and the Court can find no legal basis to selectively apply the terms of two separate contracts to create Plaintiff's cause of action.

Furthermore, even if the Court were to disregard the SWT Agreement and attempt to instead apply the Captiva Agreement, California law would require the Court to interpret the contract so as to give effect to the parties' mutual intentions, as they existed at the time of contracting. Nat'l Rural

Telecomms. Coop., 319 F. Supp. 2d at 1048.  Here, at the time that the Captiva Agreement was entered into, Captiva and SWT were separate companies, with separate contractual relationships with Plaintiff, and with separate software products.  Captiva did not own SWT, or its b-Wize Dispatcher, until approximately seven months after the effective date of the Captiva Agreement.  Thus, Captiva could not have logically intended to grant Plaintiff the right to resell a product which it did not yet own. Furthermore, Plaintiff could not have logically intended to obtain that right from Captiva, given that Plaintiff already had the right to resell b-Wize Dispatcher through its existing contract with SWT, entered into four months earlier.  Additionally, when minor disputes arose over the parties' duties and obligations after the mergers, both Plaintiff and EMC/Captiva recognized the differences between the terms of the SWT and Captiva Agreements and the parties continued to operate under the terms of the SWT Agreement when b-Wize Dispatcher was involved. (Boyd Dep. 300-06, doc. # 31-3; Exs. 30, 31 to Boyd Dep. docs. ## 31-4, 31-5; Exs. 12, 14 to Boyd Dep., docs. ## 31-18, 31-19; Def.'s Mot. Summ. J. 10, Ex. D, docs. ## 47, 47-4.) Thus, there is no basis to disregard the SWT Agreement or to conclude that the Captiva Agreement was, in actuality, the document that governed the sales of b-Wize Dispatcher post-merger.

But Plaintiff argues that the Captiva Agreement actually incorporated Captiva's Price List into the agreement and granted Plaintiff the right to resell any product listed therein unless it was labelled "NFR."  Since Captiva's price list eventually came to include SWT's b-Wize Dispatcher, Plaintiff maintains that the Captiva Agreement is applicable to these disputes.  However, this argument is unavailing.  The plain language of ¶ 1(a) of the Captiva Agreement does not even incorporate the then-current, let alone future Captiva price lists, and therefore cannot logically be interpreted to grant Plaintiff additional general rights to sell other unspecified software. The first sentence in ¶ 1(a) grants

Plaintiff the non-exclusive right to resell the "software products designated above"– FormWare, InvoicePack, ClaimPack, and Input*Accel*. (Captiva Agreement ¶ 1(a), Ex. 1-A to Pl.'s Mem. in Opp'n, doc. # 36.) The last two sentences of ¶ 1(a), on which Plaintiff relies for its argument, simply state that "[s]pecific product items . . . and their list prices are listed in the Captiva Price List. Reseller may not resell any product designated "NFR" in the price list." The first sentence here merely directs Plaintiff to the complete listing of the Software products and their prices;[5] it does not confer any new rights to sell unnamed software. The second sentence only states the obvious: if Captiva labelled a product "NFR" in its price list, then it is "Not For Resale," even if it happens to be the above-mentioned software that Plaintiff was just granted a license to resell. It would be inconsistent for Captiva to specifically grant Plaintiff the right to resell four particular software products and within that same paragraph, grant Plaintiff the right to sell everything on its price list whether "designated above" or not. The only logical and consistent reading of the unambiguous terms of this agreement, giving effect to the parties' mutual intentions at the time of contracting, is that Plaintiff could find all of the prices and different versions of the four software products it was granted the right to resell in the price list. And Plaintiff could resell those items unless they were labelled "NFR." The Captiva Agreement cannot be interpreted to authorize Plaintiff to resell any after-acquired software, such as b-Wize Dispatcher. Thus, the SWT Agreement is the only agreement that governs the above-mentioned sales or potential sales of b-Wize Dispatcher.

---

[5]For example, Plaintiff was granted the right to resell Input*Accel* and according to the September 26, 2005 Captiva Price List submitted with Plaintiff's memorandum in opposition, there are several different Input*Accel* software products including an Input*Accel* "server," "scale server," "modules," express," "einput," "PDF modules," and several "developer tools." (See Ex. 1-C to Pl.'s Mem. in Opp'n, doc. # 36-1.) Thus, these different Input*Accel* software products are the "specific product items" that could be found in the price list, along with their prices.

Plaintiff has not argued, and there is no question, that the SWT Agreement does not contain any "rules of engagement" like those in ¶ 8(d) in the Captiva Agreement. (See Pl.'s Mem. in Opp'n; SWT Agreement, Ex. A to Def.'s Mot. Summ. J., doc. # 47-1.)  Furthermore, Plaintiff's sole theory of recovery and claim for breach of contract is based on conduct that would violate ¶ 8(d) of the Captiva Agreement, that is, EMC making direct sales to Plaintiff's end-users. (Pl.'s Mem. in Opp'n; Second Am. Compl.)  Therefore, because the SWT Agreement applies to the above-mentioned seven disputes involving b-Wize Dispatcher, there is no genuine issue of material fact as to whether EMC breached the Captiva Agreement by soliciting direct sales from Plaintiff's customers.

Additionally, even assuming that Plaintiff had stated some claim for breach of the provisions of the SWT Agreement, Plaintiff agreed that it could not bring any such claims arising out of that agreement "more than one (1) year after accrual of such claim." (SWT Agreement, Art. C.8, doc. # 47-1.)  Under New York law, such agreements to shorten the applicable statute of limitations period are valid and enforceable. John J. Kassner & Co. v. City of New York, 46 N.Y.2d 544, 551 (N.Y. 1979).  In fact, Plaintiff has not attempted to argue otherwise. (See Pl.'s Mem. in Opp'n.)  A breach of contract claim generally accrues upon the breach, that is, when the plaintiff has the right to commence the action. See, e.g., Medical Facilities v. Pryke, 465 N.E.2d 39, 41 (N.Y. 1984).  In this case, all of Plaintiff's claims accrued more than one year before the filing of the Complaint on January 15, 2008.  Viewing the facts in a light most favorable to Plaintiff, the FirstMerit, Lithia Motors, CJCC, ODH, and Ohio State Term Schedule claims had all accrued by December 23, 2005, at the very latest, at the point when Mr. Boyd notified Captiva of these disputes and accused it of breach. (Boyd email, Dep. Ex. 7, doc. # 31-2.)  Further, the ACS claim accrued by February 2006 when Mr. Boyd concluded that EMC had taken the deal direct and in fact, emailed EMC notifying

24

it that it had to comply with ¶ 8(d) and requested that Results still be paid its margin. (Boyd Dep. 530, doc. # 31-9; Dep. Exs. 12, 14, docs. ## 31-18, 31-19.)  Finally, the Family Heritage Life claim accrued by July 2006, if not earlier, when Plaintiff demanded a refund based on the fact that the system problems that Family Heritage was experiencing were never resolved. (Boyd Dep. 473-76, doc. # 31-9.) Therefore, these claims are all time-barred and Defendant is entitled to judgment as a matter of law.  Consequently, the Court need not reach Defendant's alternative argument that Plaintiff's claims would also be precluded by the limitation of liability provision in the SWT Agreement barring damages for lost profits.

### B.  The Westfield Insurance Dispute

EMC argues that although the timing of the Westfield Insurance dispute is unclear, it involves a subsequent maintenance agreement that EMC entered into with Westfield and for which Plaintiff has claimed damages in the form of lost profits. (Def.'s Mot. Summ. J. 11, 37-38.)  EMC asserts that ¶ 10 of the Captiva Agreement bars this claim as it prevents Plaintiff from recovering "consequential, incidental, or special damages, even if Captiva has been apprised of the likelihood of such damages occurring . . . ." (Id. at 37-38) (quoting Captiva Agreement, ¶ 10) (all capital font in original omitted). EMC explains that because California courts will enforce limited liability provisions in contracts between sophisticated commercial parties, ¶ 10 of the Captiva Agreement precludes this claim for damages and it therefore fails as a matter of law. (Id.) (citing Nat'l Rural Telecomms. Coop., 319 F. Supp. 2d at 1055-56).

Plaintiff responds that there is a genuine issue of material fact regarding the availability of the damages that Plaintiff seeks because it is not clear whether the parties intended the limited liability provision in ¶ 10 to apply to a breach of ¶ 8(d). Plaintiff contends that unless it is able to

obtain damages for lost profits resulting from EMC's direct sales to Plaintiff's end-users, the prohibition against that conduct in ¶ 8(d) is "worthless." (Pl.'s Mem. in Opp'n 11-12.)  Plaintiff argues that the purpose of the "rules of engagement" in ¶ 8(d) is to prevent EMC from making direct sales to its end-users and to prevent EMC from building relationships with those end-users that would lead to future sales and maintenance agreements with EMC rather than with Plaintiff. (Id. at 12.)  If EMC violates those rules of engagement, the harm to Plaintiff is "in the form of lost product sales, lost future maintenance fees, and lost future profits." (Id.)  The only damages that Plaintiff would be entitled to under the limited liability provision, the amount actually paid for any products relating to the claim for breach, would also be unavailable because, Plaintiff explains, it would not have had the opportunity to purchase products yet if EMC made a direct sale in contravention of ¶ 8(d). (Id.)

In its reply brief, EMC argues that Plaintiff's attempt to create a genuine dispute about the parties' intentions surrounding the limitation of liability provision is both unsupported and flawed. (Def.'s Reply 13, doc. # 40.)  EMC asserts that Plaintiff has not offered any factual basis to support its claim that ¶ 10 might not reflect the parties' intentions.  Furthermore, EMC points out that Plaintiff's President, Mr. Boyd, never disputed the plain language of that provision at his deposition and in fact, was "indisputably familiar with these provisions, having agreed to a virtually identical provision in the SWT Agreement five (5) months earlier." (Id. at 14.)  Before signing the Captiva Agreement, Plaintiff even had the assistance of the same attorney who previously reviewed the SWT Agreement.  (Id.) (citing Boyd Dep. 476-478, doc. # 31-9).  Additionally, Mr. Boyd demonstrated full knowledge and understanding of these kind of provisions, as he explained that his company "strived" to have these same limitation of liability provisions in its contracts with all of its clients. (Id. at 14) (citing Boyd Dep. 482, doc. # 31-9).

The limitation of liability provision contained in ¶ 10 of the Captiva Agreement states:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, CAPTIVA WILL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO RESELLER FOR CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES, EVEN IF CAPTIVA HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. IN NO EVENT WILL CAPTIVA'S LIABILITY (WHETHER BASED ON AN ACTION OR CLAIM IN CONTRACT, TORT, OR OTHERWISE) TO RESELLER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREUNDER EXCEED THE AMOUNT ACTUALLY PAID BY PARTNER TO CAPTIVA FOR THE PRODUCT(S) RELATING TO SAID ACTION OR CLAIM IN CONTRACT, TORT OR OTHERWISE.

(All capital font in original).

Under California law, contract interpretation must "give effect to the mutual intention of the parties as it existed at the time of contracting . . . ." Nat'l Rural Telecomms. Coop., 319 F. Supp. 2d at 1048 (quoting Cal. Civ.Code § 1636). California law has long recognized contracting parties' rights to limit their liability in the event of breach. Id. (citing Artukovich v. Pac. States Cast Iron Pipe Co., 176 P.2d 962, 965 (Cal. Dist. Ct. App. 1947); Markborough Cal., Inc. v. Super Ct., 277 Cal. Rptr. 919, 925 (Ct. App. 1991)). A court may refuse to enforce a limitation of liability provision, however, if it is unconscionable. Id. (citing Cal. Civ. Code § 1670.5.) To determine unconscionability, courts must consider whether there is evidence of oppression and unfair surprise in the terms of the contract and whether the terms are so one-sided "as to shock the conscience." Id. (citing Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co., 246 Cal.Rptr. 823, 833 (Ct. App. 1988)).

Here, both parties are sophisticated, commercial entities that had legal representation and negotiated at an arm's length. Plaintiff has not presented any evidence that it lacked bargaining power or meaningful choice in the negotiation of this contract. Furthermore, there is no unfair

surprise where the provision is clearly labelled "LIMITED LIABILITY TO PARTNER AND OTHERS," and written in all capital letters. Additionally, Plaintiff has not claimed it did not understand the implications or meaning of ¶ 10, nor could it, given that Plaintiff has admitted that it "strives" to limit its own liability in the same manner. (Boyd Dep. 482, doc. # 31-9.) And although this provision protects EMC/Captiva, and limits its liability, it does not "shock the conscience" or result in an entirely one-sided contract. Plaintiff gains certain benefits, including marketing support and product discounts which enable it to make a larger profit on sales of Captiva software. Thus, the limited liability provision here is not unconscionable as a matter of law.

But Plaintiff has argued that, in effect, this limited liability provision deprives it of any contractual remedy, because it only allows Plaintiff to recover the price it paid for the Captiva product involved in EMC/Captiva's breach; if EMC/Captiva has made a direct sale to one of Plaintiff's end-users, then Plaintiff would not have had the opportunity to purchase the product for resale to the end-user. Therefore, Plaintiff has argued that there is a genuine dispute as to whether the provision applies to breaches of ¶ 8(d) and also as to what damages should be recoverable as a result of this breach. (Pl.'s Mem. in Opp'n 12-14.) Defendant concedes that under California law, if the limitation of liability provision "fails of its essential purpose," then the aggrieved party may be able to avoid its enforcement. (Def.'s Reply 15.) However, a limited remedy only 'fails its essential purpose when the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave Plaintiff with no remedy at all.' (Id. at 16) (quoting Nat'l Rural Telecomms. Coop., 319 F. Supp. 2d at 1055).

Here, Plaintiff agreed to a limited remedy entitling it to recover only those amounts "actually paid" to EMC/Captiva for the product involved in EMC/Captiva's breach. Plaintiff has not presented

28

any evidence as to how circumstances have changed since the time of contracting such that this limited remedy actually provides no remedy at all.  In fact, the circumstances surrounding the Westfield Insurance dispute belie the general point that Plaintiff has attempted to make above.  With respect to the Westfield Insurance dispute, Plaintiff has claimed that "EMC breached the Captiva Agreement by usurping the annual maintenance fees for a Captiva solution directly from Westfield Insurance <u>after</u> Results sold the product." (Pl.'s Mem. in Opp'n 14) (emphasis added).  Thus, EMC's alleged breach of ¶ 8(d) occurred <u>after</u> Plaintiff had already made a sale of the product.  If Plaintiff did in fact purchase that solution from EMC/Captiva for Westfield, then Plaintiff was entitled to seek that amount in damages after EMC allegedly breached the Captiva Agreement.  Plaintiff has not alleged that it paid EMC/Captiva for that product and therefore, the situation before the Court is not one where enforcement of the limited remedy leaves Plaintiff with no remedy at all, but rather, is one where Plaintiff is <u>not</u> <u>entitled</u> to that limited remedy, or has foregone that limited remedy by never seeking a refund of amounts actually paid to EMC/Captiva.  Thus, Plaintiff has not raised a genuine issue of material fact that ¶ 10 fails its essential purpose.

Plaintiff contractually agreed to waive its claims to all damages other than amounts it actually paid to EMC/Captiva for its products.  In exchange for that waiver, Plaintiff received other benefits of being a non-exclusive reseller of Captiva software under the Captiva Agreement.  Thus, if Plaintiff had paid Defendant for one of its products with the intention to resell it to an end-user, an intention thwarted by Captiva's sale to the end-user, Plaintiff agreed that it was not entitled to consequential damages. Consequently, Plaintiff's only claim for damages, set forth in the Second Amended Complaint as well as the Memorandum in Opposition to Defendant EMC's Motion for Summary Judgment, is precluded by the limitation of liability provision in ¶ 10 of the Captiva Agreement.

Therefore, EMC is entitled to summary judgment on this claim.

### C. The ODPS Dispute

EMC argues that it is also entitled to summary judgment on this final claim involving ODPS because the only contract pertinent to this dispute, the Marketing Support Agreement, does not bar EMC from making direct sales to Plaintiff's potential end-users[6]. (Def.'s Mot. Summ. J. 43.) Instead, this agreement, entered into on November 30, 2004, approximately one year before EMC would acquire Captiva, only obligated EMC to provide Plaintiff with access to certain marketing tools to assist Plaintiff in its opportunity with EMC's distributor, Optical Laser. (Id. at 12; Marketing Support Agreement, Ex. E to Def.'s Mot. Summ. J. doc. # 47-5.) Plaintiff apparently had an opportunity sell EMC's Centera hardware to ODPS through Plaintiff's reseller agreement with Optical Laser. Thus, EMC was only providing marketing support and did not undertake any other obligations under this contract. (Def.'s Mot. Summ. J. 12.) In any event, EMC ultimately partnered with Unisys, a reseller of Centera, to close this deal with ODPS and paid Unisys accordingly. (Id.)

In response, Plaintiff produces a new document entitled "Deal Registration–Rules of Engagement & Guidelines," that allegedly governs its claim for breach with respect to the ODPS opportunity. (Ex. 1-E to Pl.'s Mem. in Opp'n, doc. # 36-6.) Plaintiff claims that it was required to submit a partner deal registration to EMC for approval of its opportunity with ODPS. (Boyd Aff. ¶ 12, Ex. 1 to Pl.'s Mem. in Opp'n, doc. # 36-1.) Plaintiff claims that this request for registration of the opportunity was approved. (Id.) Plaintiff maintains that the "Deal Registration" guidelines

---

[6]EMC also argues that Mr. Boyd's deposition testimony that EMC's State Term Schedule gives rise to this claim fails as a matter of law. Plaintiff did not respond to this argument, nor is this theory in either of Plaintiff's amended complaints. Nevertheless, the Court has reviewed the state term contract and agrees that it does not confer any rights on Plaintiff. (See Ex. G to Def.'s Mot. Summ. J., doc. # 47-7.)

ensured that it would receive support from EMC, both in marketing and in better pricing, in order to close this deal. (Pl.'s Mem. in Opp'n 16; Boyd Aff. ¶ 14.)  Plaintiff claims that EMC refused to provide the special pricing, in violation of the "Deal Registration–Rules of Engagement & Guidelines," costing it this opportunity with ODPS. (Pl.'s Mem. in Opp'n 16; Boyd Aff. ¶¶ 16-18.)

EMC replies that first, these "Rules of Engagement" are irrelevant as the document is dated June 2008, approximately three years after the alleged registration of this opportunity. (Def.'s Reply 18.)  The Marketing Support Agreement, the only signed contract between the parties, has an integration clause mandating that there must be a signed writing in order to modify or amend the agreement and this "Rules of Engagement" document is not otherwise incorporated into the Marketing Support Agreement. (Id.) (citing Marketing Support Agreement, ¶ 13.1, doc. # 47-5.) Second, EMC argues that Plaintiff should be precluded from relying on this document because Plaintiff never identified or produced these "Rules of Engagement" until now; after discovery has been closed and summary judgment is pending. (Id. at 20.)  EMC argues that Plaintiff cannot now change its theory of recovery at this point of the litigation, in order to defeat summary judgment. (Id.) (citing Priddy v. Edelman, 883 F.2d 438, 446 (6th Cir. 1989)).  Finally, EMC maintains that Plaintiff has no claim for breach of contract because there is no contract between the parties that precludes EMC's conduct with respect to the ODPS deal.

The Court agrees with EMC and finds that the only contract relevant to this dispute, the Marketing Support Agreement,  never precluded EMC from engaging or assisting another reseller with the opportunity with ODPS. (See Ex. E to Def.'s Mot. Summ. J., doc. # 47-5.)  In both the Amended and Second Amended Complaints, Plaintiff maintained that ¶ 8(d) of the Captiva Agreement applied to this dispute and that EMC had breached that provision by making a direct sale

to ODPS. (Am. Compl. ¶¶ 25-29, 39-40; Second Am. Compl. ¶¶ 25-29, 50-51.)  During Mr. Boyd's deposition however, he identified the Marketing Support Agreement and EMC's state term contract as the basis of Result's breach of contract claim. (Boyd Dep. 492-95, doc. # 31-9.)  Only now, in response to summary judgment, has Plaintiff produced another document and formally changed its theory of recovery on this claim. However, even if Plaintiff's late production and change of theory were not problematic, the "Rules of Engagement & Guidelines" post-dates the ODPS dispute by three years, and Plaintiff makes no attempt to explain how this June 2008 document could have governed the parties' relationship in 2004 and 2005.

Therefore, the Court finds that EMC has met its initial burden, and Plaintiff has failed to establish that there is a genuine issue of material fact as to the existence of an applicable contract, let alone breach of that contract, that would have precluded EMC's deal with ODPS.  Thus, Defendant is entitled to judgment as a matter of law on this claim.

## V.    Conclusion

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment (doc. # 47).

**IT IS SO ORDERED.**

Date: July 16, 2010                                    **/s/ John D. Holschuh**
                                                       John D. Holschuh, Judge
                                                       United States District Court

32